# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHERI CLEARWATER, derivatively on behalf of AMGEN INC., <br><br>     Plaintiff, <br><br>     v. <br><br> ROBERT A. BRADWAY, PETER H. GRIFFITH, WANDA M. AUSTIN, BRIAN J. DRUKER, ROBERT A. ECKERT, GREG C. GARLAND, CHARLES M. HOLLEY, JR, S. OMAR ISHRAK, TYLER JACKS, ELLEN J. KULLMAN, AMY E. MILES, RONALD D. SUGAR, and R. SANDERS WILLIAMS, <br><br>     Defendants, <br><br>     and <br><br> AMGEN INC., <br><br>     Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Cheri Clearwater ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Amgen Inc. ("Amgen" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Robert A. Bradway ("Bradway"), Peter H. Griffith ("Griffith"), Wanda M. Austin ("Austin"), Brian J. Druker ("Druker"), Robert A. Eckert ("Eckert"), Greg C. Garland ("Garland"), Charles M. Holley, Jr. ("Holley"), S. Omar Ishrak ("Ishrak"), Tyler Jacks ("Jacks"), Ellen J. Kullman ("Kullman"), Amy E. Miles ("Miles"), Ronald

D. Sugar ("Sugar"), and R. Sanders Williams ("Williams") (collectively, the "Individual Defendants," and together with Amgen, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Amgen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amgen, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 29, 2020 through April 27, 2022 (the "Relevant Period").

2.     Amgen is a Delaware biopharmaceutical corporation based in California that develops, manufactures, and distributes human therapeutics for patients suffering from serious illnesses. The Company operates in approximately 100 countries worldwide. In addition, Amgen operates an internal manufacturing network for commercial production, which allows the Company to perform its drug manufacturing and device assembly in the United States, its territory

in Puerto Rico, and internationally.

3.      Amgen has long claimed to be properly taking advantage of favorable tax benefits provided by the Company's operations in Puerto Rico. Puerto Rico was continuously treated as a foreign jurisdiction for U.S. tax purposes, thereby allowing the Company to receive favorable tax benefits, which included a lower income tax, tax incentive grants available to Amgen for upcoming years, and undistributed foreign earnings for which no U.S. income taxes or foreign withholding taxes were provided, as such holdings would purportedly be invested indefinitely outside the United States.

4.      However, following an audit by the Internal Revenue Service ("IRS") in early 2017, the Company received Notices of Proposed Adjustment ("NOPAs") for the tax years 2010, 2011, and 2012. NOPAs are notices "generated when there is a difference between what the taxpayer reported on the tax return versus what was reported to the IRS by an employer, a bank or other payer."[1] The NOPAs here mainly arose from the profit allocations between the Company's facilities in the United States and Puerto Rico.

5.      On April 12, 2017, the Company received a Revenue Agent's Report ("RAR") from the IRS for the tax years 2010, 2011, and 2012. An RAR is "a detailed document that describes an IRS examiner's audit findings and states the amount of deficiency or refund the agent finds the taxpayer to owe or be owed, respectively."[2] The RAR contained proposed adjustments and was followed by the Company's receipt of a modified RAR in November 2017, also for tax years 2010, 2011, and 2012.

---

[1]                              https://www.accountingplusinc.com/resources/quick-reads/irs-notices-101#:~:text=CP2000%3A%20Notice%20of%20proposed%20adjustment,can%20result%20in%20a%20refund.

[2] https://www.investopedia.com/terms/r/rar.asp#:~:text=The%20Revenue%20Agent's%20Report%20(RAR,owe%20or%20be%20owed%2C%20respectively.

6.      Later, in April 2020, the Company received NOPAs proposing similar adjustments to Amgen's profit allocation for the tax years 2013, 2014, and 2015. These NOPAs were again followed by receipt of an RAR for tax years 2013, 2014, and 2015 in May 2020.

7.      After receiving the NOPAs and related RARs, the Company failed to disclose the material adverse facts contained therein to investors. Instead, the Company concealed these facts from investors whilst simultaneously failing to take any meaningful accrual or otherwise reveal the massive amount of back taxes and penalties claimed by the United States government against the Company. Furthermore, the Company's SEC filings around this time period (and similar statements pertaining to its financial results) failed to disclose the known trends, uncertainties, and true risks which resulted from Amgen's receipt of the RARs and the Company's failure to dissuade the IRS from the positions it held which were adverse to Amgen.

8.      After a series of partial disclosures, the truth fully emerged on April 27, 2022 when Amgen revealed that it had received a Notice of Deficiency from the IRS seeking more than $10 billion in back taxes and penalties which stemmed from the Company's improper profit allocation and tax avoidance strategies.

9.      On this news, the price per share of Amgen common stock dropped 4.3%, or $10.66, from a closing price of $248.79 per share on April 27, 2022 to close at $238.13 per share on April 28, 2022.  In the following days, the Company's stock price continued to decline, reaching a low of just $227.32 per share on May 2, 2022, which represented an 8.6% decline from the closing price on April 27, 2022.

10.      During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and

prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the U.S. government alleged that more than $3 billion in back taxes was owed by Amgen for the years 2010, 2011, and 2012; (2) the U.S. government alleged that more than $5 billion in back taxes was owed by Amgen for the years 2013, 2014, and 2015; (3) the U.S. government would likely allege the Company owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which Amgen had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (4) the Company failed to take sufficient accruals to account for its outstanding tax liabilities; (5) the Company failed to comply with ASC 450 and other applicable regulations when preparing its SEC filings; (6) the Company's refusal to pay its outstanding taxes to the U.S. government exposed Amgen to a significant risk of severe financial penalties imposed by the IRS; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11.     Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Amgen to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between July 2020 and April 2022, approximately 12 million shares of Amgen common stock were repurchased, costing the Company over $2.9 billion. As the Company's stock was actually worth only $238.13 per share, the price at which it was trading when markets closed on April 27, 2022, the Company overpaid for repurchases of its own stock by over $97.3 million in total.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the CEO's and CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R.

§240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Amgen. Plaintiff has continuously held Amgen common stock since September 21, 2020.

### Nominal Defendant Amgen

21.     Amgen is a Delaware corporation with its principal executive offices at One Amgen Center Drive, Thousand Oaks, California 91320-1799. Amgen shares trade on the NASDAQ under the ticker symbol "AMGN."

### Defendant Bradway

22.     Defendant Bradway is CEO of the Company and has served as a Company director since August 2011 and as Chairman of the Board since 2013. He previously served as the Company's Chief Operating Officer from 2010 to 2012 and as its Executive Vice President and CFO from 2007 to 2010. According to the proxy statement that the Company filed with the SEC on April 6, 2023 (the "2023 Proxy Statement"), as of March 20, 2023, Defendant Bradway

beneficially owned 1,209,324 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Bradway owned approximately $283.9 million worth of Amgen stock.

23.     For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Bradway received $21,399,733 in total compensation from the Company. This included $1,722,300 in salary, $11,138,544 in stock awards, $4,773,714 in option awards, $3,122,000 in non-equity incentive plan compensation, and $643,175 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Bradway received $21,721,154 in total compensation from the Company. This included $1,674,061 in salary, $11,138,622 in stock awards, $4,773,710 in option awards, $3,420,000 in non-equity incentive plan compensation, and $714,761 in all other compensation. For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Bradway received $20,131,408 in total compensation from the Company. This included $1,647,538 in salary, $10,079,676 in stock awards, $4,319,993 in option awards, $3,495,000 in non-equity incentive plan compensation, and $589,201 in all other compensation.

24.     The 2023 Proxy Statement stated the following about Defendant Bradway:

Robert A. Bradway has served as our director since 2011 and Chairman of the Board since 2013. Mr. Bradway has been our President since 2010 and Chief Executive Officer since 2012. From 2010 to 2012, Mr. Bradway served as our Chief Operating Officer. Mr. Bradway joined Amgen in 2006 as Vice President, Operations Strategy and served as Executive Vice President and Chief Financial Officer from 2007 to 2010. Prior to joining Amgen, he was a Managing Director at Morgan Stanley in London where, beginning in 2001, he had responsibility for the firm's banking department and corporate finance activities in Europe.

Mr. Bradway has been a director of The Boeing Company, an aerospace company and manufacturer of commercial airplanes, defense, space and securities systems, since 2016, serving as the Chair of the Finance Committee and a member of the Governance and Public Policy Committee. From 2011 to 2017, Mr. Bradway was a director of Norfolk Southern Corporation, a transportation company. He has

served on the board of trustees of the USC since 2014. Mr. Bradway holds a bachelor's degree in biology from Amherst College and a master's degree in business administration from Harvard Business School.

### Defendant Griffith

25.     Defendant Griffith has served as the Company's CFO since January 2020. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Griffith beneficially owned 43,031 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Griffith owned approximately $10.1 million worth of Amgen stock.

26.     For the 2022 Fiscal Year, Defendant Griffith received $7,073,735 in total compensation from the Company. This included $1,044,492 in salary, $3,149,736 in stock awards, $1,349,995 in option awards, $1,262,000 in non-equity incentive plan compensation, and $267,512 in all other compensation. For the 2021 Fiscal Year Defendant Griffith received $6,664,034 in total compensation from the Company. This included $1,014,963 in salary, $2,799,665 in stock awards, $1,199,979 in option awards, $1,382,000 in non-equity incentive plan compensation, and $267,427 in all other compensation. For the 2020 Fiscal Year, Defendant Griffith received $6,565,830 in total compensation from the Company. This included $998,864 in salary, $2,799,625 in stock awards, $1,199,958 in option awards, $1,413,000 in non-equity incentive plan compensation, and $154,383 in all other compensation.

27.     The Company's website states the following about Defendant Griffith:

Peter Griffith became executive vice president and Chief Financial Officer in January 2020. Previously, he was executive vice president, Finance.

He joined Amgen in 2019 from Sherwood Canyon Group, LLC, a private equity and advisory firm, where he served as president. Previously, he retired from EY (formerly Ernst & Young), a leader in assurance, tax, transaction and advisory services, after a distinguished career there, including almost 22 years as a partner. Most recently, Griffith served as EY's Global Vice Chair, Corporate Development

with responsibility for driving the firm's international growth and expanding its capabilities worldwide. He also served as EY's Global Managing Partner, Operations and Finance during a time when the organization grew annual revenues more than 25 percent to over $27 billion. This latter role included the Finance and Accounting, Corporate Development, Tax, and Treasury functions. Prior to EY, he was a Managing Director and head of the investment banking division of Wedbush Securities Inc.

Griffith was recognized by the Los Angeles chapter of the National Association of Women Business Owners as its first ever "Man of the Year." He is a member of the Advisory Board for USC's Shaffer Center for Health Policy and Economics. He is also a member of the USC Marshall School of Business Board of Leaders. He received his bachelor's degree from the University of Southern California's Marshall School of Business.

### Defendant Austin

28.     Defendant Austin has served as Company director since 2017. She also serves as a member of the Audit Committee and the Compensation and Management Development Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Austin beneficially owned 4,886 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Austin owned approximately $1.1 million worth of Amgen stock.

29.     For the 2022 Fiscal Year, Defendant Austin received $359,774 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,774 in stock awards, and $20,000 in all other compensation. For the 2021 Fiscal Year, Defendant Austin received $359,970 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,970 in stock awards, and $20,000 in all other compensation. For the 2020 Fiscal Year, Defendant Austin received $344,961 in total compensation from the Company. This included $125,000 in fees earned or paid in cash, $199,961 in stock awards, and $20,000 in all other compensation.

30.     The 2023 Proxy Statement stated the following about Defendant Austin:

Wanda M. Austin is the retired President and Chief Executive Officer of The Aerospace Corporation, a leading architect of the United States' national security space programs, where she served from 2008 until her retirement in 2016. From 2004 to 2007, Dr. Austin was Senior Vice President, National Systems Group of The Aerospace Corporation. Dr. Austin joined The Aerospace Corporation in 1979 and served in various positions from 1979 until 2004.

Dr. Austin was the Interim President of the University of Southern California, or USC, from 2018 to 2019 and has served as an Adjunct Research Professor at USC's Viterbi School of Engineering since 2007. She is the co-founder of MakingSpace, Inc., where she serves as a motivational speaker on science, technology, engineering, and mathematics (STEM) education. Dr. Austin has been a director of Chevron Corporation, a petroleum, exploration, production and refining company, since 2016 and lead independent director since May 2022, serving as the Chair of the Board Nominating and Governance Committee and a member of the Management Compensation Committee. Dr. Austin has been a director of Virgin Galactic Holdings, Inc., a commercial space flight company, since 2019, serving as the Chair of the Compensation Committee and a member of the Safety Committee. Dr. Austin is a life trustee of USC, having served as a voting trustee from 2010 to 2021, and previously served on the boards of directors of the National Geographic Society and the Space Foundation. Dr. Austin received an undergraduate degree from Franklin & Marshall College, a master's degree from the University of Pittsburgh, and a doctorate from USC. She is a member of the National Academy of Engineering.

**Defendant Druker**

31.    Defendant Druker has served as a Company director since 2018. He also serves as a member of the Compensation and Management Development Committee and the Corporate Responsibility and Compliance Committee.

32.    For the 2022 Fiscal Year, Defendant Druker received $359,774 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,774 in stock awards, and $20,000 in all other compensation. For the 2021 Fiscal Year, Defendant Druker received $359,970 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,970 in stock awards, and $20,000 in all other compensation. For the 2020 Fiscal Year, Defendant Druker received $329,961 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $199,961 in stock awards, and

11

$10,000 in all other compensation.

33.     The 2023 Proxy Statement stated the following about Defendant Druker:

Brian J. Druker joined Oregon Health & Science University, or OHSU, in 1993 and is currently a physician-scientist and professor of medicine. Dr. Druker has served as the director of the OHSU Knight Cancer Institute since 2007, associate dean for oncology of the OHSU School of Medicine since 2010, and the JELD-WEN chair of leukemia research at OHSU since 2001. He was an investigator with the Howard Hughes Medical Institute, a nonprofit medical research organization, from 2002 to 2019.

Dr. Druker has been a director of Vincerx Pharma, Inc., a biopharmaceutical company, since December 2020, and serves on its Nominating and Corporate Governance Committee. Dr. Druker has been a member of the scientific advisory board of Aptose Biosciences Inc., a biotechnology company, since 2013. Dr. Druker served on the scientific advisory board from 2016 to 2019 and, since 2021, has been a consultant to GRAIL, Inc., a biotechnology company that was acquired by Illumina, Inc. in 2021. In 2011, he founded Blueprint Medicines Corporation, a biopharmaceutical company, and remains as a scientific advisor to this company. In 2006, he founded MolecularMD, a privately-held molecular diagnostics company that was acquired by ICON plc in 2019.

Dr. Druker has received numerous awards, including the Lasker-DeBakey Clinical Research Award in 2009, the Japan Prize in Healthcare and Medical Technology in 2012, the Albany Medical Center Prize in 2013, and the Sjöberg Prize in 2019, for influential work in the development of STI571 (Gleevec®) for the treatment of chronic myeloid leukemia. He was elected to the National Academy of Sciences in 2012 as well as the National Academy of Medicine in 2007. Dr. Druker received both an undergraduate degree and his medical doctorate from the University of California, San Diego.

**Defendant Eckert**

34.     Defendant Eckert is the Company's Lead Independent Director and has served as a Company director since August 2012. He also serves as Chair of the Compensation and Management Development Committee and as a member of the Executive Committee and the Governance and Nominating Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Eckert beneficially owned 7,044 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023

was $234.72, Defendant Eckert owned approximately $1.7 million worth of Amgen stock.

35.    For the 2022 Fiscal Year, Defendant Eckert received $419,774 in total compensation from the Company. This included $190,000 in fees earned or paid in cash, $209,774 in stock awards, and $20,000 in all other compensation. For the 2021 Fiscal Year, Defendant Eckert received $419,970 in total compensation from the Company. This included $190,000 in fees earned or paid in cash, $209,970 in stock awards, and $20,000 in all other compensation. For the 2020 Fiscal Year, Defendant Eckert received $394,961 in total compensation from the Company. This included $175,000 in fees earned or paid in cash, $199,961 in stock awards, and $20,000 in all other compensation.

36.    The 2023 Proxy Statement stated the following about Defendant Eckert:

Robert A. Eckert is our lead independent director. Mr. Eckert has been an Operating Partner at FFL Partners, LLC (formerly known as Friedman Fleischer & Lowe, LLP), a private equity firm, since 2014. Mr. Eckert was the Chief Executive Officer of Mattel, Inc., a toy design, manufacture and marketing company, having held this position from 2000 through 2011, and its Chairman of the Board from 2000 through 2012. He was President and Chief Executive Officer of Kraft Foods Inc., a consumer packaged food and beverage company, from 1997 to 2000, Group Vice President from 1995 to 1997, President of the Oscar Mayer Foods Division from 1993 to 1995 and held various other senior executive and other positions from 1977 to 1992.

Mr. Eckert has been a director of McDonald's Corporation, a company that franchises and operates McDonald's restaurants in the global restaurant industry, since 2003, serving as a member of the Public Policy and Strategy Committee and the Governance Committee. Mr. Eckert also has served as a director of Levi Strauss & Co., a jeans and casual wear manufacturer, since 2010 and non-executive Chair of the Board since 2021, serving as the Chair of the Nominating, Governance and Corporate Citizenship Committee and a member of the Compensation and Human Capital Committee. Mr. Eckert has been a director of Uber Technologies, Inc., a personal mobility, meal delivery and logistics technology platform, since 2020, serving as the Chair of the Compensation Committee and a member of the Nominating and Governance Committee. He was appointed a director of Eyemart Express Holdings LLC, a privately-held eyewear retailer and portfolio company of FFL Partners, LLC, in 2015. Mr. Eckert is on the Global Advisory Board of the Kellogg School of Management at Northwestern University and serves on the Eller College National Board of Advisors at the University of Arizona. Mr. Eckert

received an undergraduate degree from the University of Arizona and a master's degree in business administration from the Kellogg School of Management at Northwestern University.

**Defendant Garland**

37.     Defendant Garland has served as a Company director since 2013. He also serves as the Chair of the Governance and Nominating Committee and as a member of the Executive Committee and Compensation and Management Development Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Garland beneficially owned 10,716 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Garland owned approximately $2.5 million worth of Amgen stock.

38.     For the 2022 Fiscal Year, Defendant Garland received $379,774 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $209,774 in stock awards, and $20,000 in all other compensation. For the 2021 Fiscal Year, Defendant Garland received $379,970 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $209,970 in stock awards, and $20,000 in all other compensation. For the 2020 Fiscal Year, Defendant Garland received $359,961 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $199,961 in stock awards, and $20,000 in all other compensation.

39.     The 2023 Proxy Statement stated the following about Defendant Garland:

Greg C. Garland is the Executive Chairman of the board of directors of Phillips 66, a diversified energy manufacturing and logistics company, having held this position since July 2022, and chairs its Executive Committee. Mr. Garland served as Chairman and Chief Executive Officer of Phillips 66 from 2012 to June 2022. Prior to Phillips 66, Mr. Garland served as Senior Vice President, Exploration and Production, Americas of ConocoPhillips from 2010 to 2012. He was President and Chief Executive Officer of Chevron Phillips Chemical Company (now a joint venture between Phillips 66 and Chevron) from 2008 to 2010 and Senior Vice

14

President, Planning and Specialty Chemicals from 2000 to 2008. Mr. Garland served in various positions at Phillips Petroleum Company from 1980 to 2000. Mr. Garland is a member of the Engineering Advisory Council for Texas A&M University. Mr. Garland received an undergraduate degree from Texas A&M University.

**Defendant Holley**

40.     Defendant Holley has served as a Company director since 2017. He also serves as the Chair of the Audit Committee and as a member of the Executive Committee and the Governance and Nominating Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Holley beneficially owned 1,260 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Holley owned approximately $295,747 worth of Amgen stock.

41.     For the 2022 Fiscal Year, Defendant Holley received $369,776 in total compensation from the Company. This included $160,000 in fees earned or paid in cash and $209,774 in stock awards. For the 2021 Fiscal Year, Defendant Holley received $369,970 in total compensation from the Company, made up entirely of stock awards. For the 2020 Fiscal Year, Defendant Holley received $354,961 in total compensation from the Company. This included $145,000 in fees earned or paid in cash, $199,961 in stock awards, and $10,000 in all other compensation.

42.     The 2023 Proxy Statement stated the following about Defendant Holley:

Charles M. Holley, Jr. is the former Executive Vice President and Chief Financial Officer for Wal-Mart Stores, Inc., or Walmart, where he served from 2010 to 2015 and as Executive Vice President in January 2016. Prior to this, Mr. Holley served as Executive Vice President, Finance and Treasurer of Walmart from 2007 to 2010. From 2005 to 2006, he served as Senior Vice President of Walmart and prior to that, as Senior Vice President and Controller from 2003 to 2005. Mr. Holley served various roles in Wal-Mart International from 1994 through 2002. Prior to this, Mr. Holley served in various roles at Tandy Corporation. He spent more than ten years with Ernst & Young LLP. Mr. Holley was an Independent Senior Advisor, U.S. CFO Program, at Deloitte LLP, a privately-held provider of audit, consulting, tax,

and advisory services, from 2016 to 2019.

Mr. Holley has been a director of Phillips 66, since 2019 and serves on the Audit and Finance, and Public Policy and Sustainability Committees. Mr. Holley has also been a director of Carrier Global Corporation, a provider of heating, ventilating, air conditioning (HVAC), refrigeration, fire, and security solutions, since 2020 and chairs the Audit Committee and serves as a member of the Compensation Committee. Mr. Holley is a lifetime member of the Advisory Council for the McCombs School of Business at the University of Texas at Austin and a member of the University of Texas Presidents' Development Board. Mr. Holley received an undergraduate degree from the University of Texas at Austin and a master's degree in business administration from the University of Houston.

### Defendant Ishrak

43.     Defendant Ishrak has served as a Company director since 2021. He also serves as a member of the Compensation and Management Development Committee and the Corporate Responsibility and Compliance Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Ishrak beneficially owned 935 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Ishrak owned approximately $219,463 worth of Amgen stock.

44.     For the 2022 Fiscal Year, Defendant Ishrak received $359,890 in total compensation from the Company. This included $339,774 in stock awards and $20,116 in all other compensation. For the 2021 Fiscal Year, Defendant Ishrak received $240,933 in total compensation. This included $65,000 in fees earned or paid in cash, $174,914 in stock awards, and $1,019 in all other compensation.

45.     The 2023 Proxy Statement stated the following about Defendant Ishrak:

S. Omar Ishrak is the former Executive Chairman and Chairman of the Board of Medtronic plc, or Medtronic, a global medical technology company. Dr. Ishrak served as the Chief Executive Officer of Medtronic from 2011 to April 2020 and was Executive Chairman until December 2020. Prior to joining Medtronic, he served as President and Chief Executive Officer of GE Healthcare Systems, a provider of medical imaging and diagnostic technology and a division of GE Healthcare, from 2009 to 2011. Dr. Ishrak was President and Chief Executive

Officer of GE Healthcare Clinical Systems from 2005 to 2008 and President and Chief Executive Officer of GE Healthcare Ultrasound and BMD from 1995 to 2004.

Dr. Ishrak has been a director of Intel Corporation, a multinational corporation and technology company, since 2017, serving as a member of the Compensation Committee and Corporate Governance and Nominating Committee, and Chairman of its Board from 2020 until January 2023. He has served as Chairman of the Board of Directors of Compute Health Acquisition Corporation, a special purpose acquisition company, since 2021. Dr. Ishrak is a member of the Board of Trustees of the Asia Society, an educational organization dedicated to promoting mutual understanding and strong partnerships between Asia and the U.S. Since 2021, Dr. Ishrak has been a senior advisor to Blackstone Life Sciences, a segment of Blackstone Inc. that invests in the biopharmaceutical and medical technology industries. Dr. Ishrak was inducted into the American Institute for Medical and Biological Engineering College of Fellows in 2016, elected as a Fellow of King's College London in 2017, inducted into the Bakken Society in 2020, and elected to the National Academy of Engineering in 2020. Dr. Ishrak received his undergraduate degree and doctorate from the University of London, King's College.

### Defendant Jacks

46.     Defendant Jacks has served as a Company director since August 2012.  He also serves as a member of the Compensation and Management Development Committee and the Corporate Responsibility and Compliance Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Jacks beneficially owned 2,727 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Jacks owned approximately $640,081 worth of Amgen stock.

47.     For the 2022 Fiscal Year, Defendant Jacks received $359,774 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,774 in stock awards, and $20,000 in all other compensation. For the 2021 Fiscal Year, Defendant Jacks received $339,970 in total compensation from the Company. This included $130,000 in fees earned or paid in cash and $209,970 in stock awards. For the 2020 Fiscal Year, Defendant Jacks

17

received $324,899 in total compensation from the Company. This included $120,000 in fees earned or paid in cash, $199,961 in stock awards, and $4,938 in all other compensation.

48.     The 2023 Proxy Statement stated the following about Defendant Jacks:

Tyler Jacks joined the faculty of Massachusetts Institute of Technology, or MIT, in 1992 and is currently the David H. Koch Professor of Biology, a position he has held since 2007, and founding director of the David H. Koch Institute for Integrative Cancer Research, which brings together biologists and engineers to improve detection, diagnosis and treatment of cancer, having served as director from 2007 to 2021. Since 2021, Dr. Jacks has served as President and director of Break Through Cancer, a foundation bringing together multidisciplinary cancer research teams selected from across five participating institutions.(1) Dr. Jacks was an investigator with the Howard Hughes Medical Institute, a nonprofit medical research organization, from 1994 until 2021.

Dr. Jacks has been a director of Thermo Fisher Scientific, Inc., a life sciences supply company, since 2009, serving as the Chair of its Science and Technology Committee and as a member of its Strategy and Finance Committee and its scientific advisory board. In 2006, he co-founded T2 Biosystems, Inc., a biotechnology company, and served on its scientific advisory board until 2013. Dr. Jacks has served on the scientific advisory board of SQZ Biotechnologies Company, a biotechnology company, since 2015. Dr. Jacks served on the scientific advisory board of Aveo Pharmaceuticals Inc., a biopharmaceutical company, from 2001 until 2013. In 2015, Dr. Jacks founded Dragonfly Therapeutics, Inc., a privately-held biopharmaceutical company, and serves as the Chair of its scientific advisory board. In 2011, he was appointed to the National Cancer Advisory Board, which advises and assists the Director of the National Cancer Institute with respect to the National Cancer Program, and served as Chair until 2016. In 2016, Dr. Jacks was named to a blue ribbon panel of scientists and advisors established as a working group of the National Cancer Advisory Board and served as co-Chair advising the Cancer MoonshotSM Task Force. Dr. Jacks was a director of MIT's Center for Cancer Research from 2001 to 2007 and received numerous awards including the Paul Marks Prize for Cancer Research and the American Association for Cancer Research Award for Outstanding Achievement. He was elected to the National Academy of Sciences as well as the National Academy of Medicine in 2009 and received the MIT Killian Faculty Achievement Award in 2015. Dr. Jacks received an undergraduate degree from Harvard University and his doctorate from the University of California, San Francisco.

**Defendant Kullman**

49.     Defendant Kullman has served as a Company director since 2016. She also serves as a member of the Audit Committee and the Governance and Nominating Committee. According

18

to the 2023 Proxy Statement, as of March 20, 2023, Defendant Kullman beneficially owned 410 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Kullman owned approximately $96,235 worth of Amgen stock.

50.     For the 2022 Fiscal Year, Defendant Kullman received $359,912 in total compensation from the Company. This included $339,774 in stock awards and $20,138 in all other compensation. For the 2021 Fiscal Year, Defendant Kullman received $359,993 in total compensation from the Company. This included $339,970 in stock awards and $20,023 in all other compensation. For the 2020 Fiscal Year, Defendant Kullman received $344,961 in total compensation from the Company. This included $324,961 in stock awards and $20,000 in all other compensation.

51.     The 2023 Proxy Statement stated the following about Defendant Kullman:

Ellen J. Kullman is Executive Chair of Carbon, Inc., or Carbon, a privately-held 3D printing company, having held this position since June 2022. Ms. Kullman served as President and Chief Executive Officer of Carbon from 2019 to June 2022, and has been a member of its board since 2016. She is the former President, Chair and Chief Executive Officer of E.I. du Pont de Nemours and Company, or DuPont, a science and technology-based company, where she served from 2009 to 2015. Prior to this, Ms. Kullman served as President of DuPont from 2008 to 2009. From 2006 through 2008, she served as Executive Vice President of DuPont. Prior to that, Ms. Kullman was Group Vice President, DuPont Safety and Protection.

Ms. Kullman has been a director of Goldman Sachs Group, Inc., an investment banking firm, since 2016, chairing its Public Responsibilities Committee and serving on its Compensation and Corporate Governance and Nominating Committees. Ms. Kullman has been a director of Dell Technologies Inc., a technology company, since 2016, serving on its Audit Committee. Ms. Kullman served as a director of United Technologies Corporation, a technology products and services company, from 2011 (and as lead director from 2018), serving on its Compensation, Finance and Executive Committees, until its merger with Raytheon Company in 2020. Ms. Kullman served as a director of General Motors, from 2004 to 2008, serving on its Audit Committee.

Ms. Kullman has served on the Board of Trustees of Northwestern University since

2016 and is a Trustee Emerita of Tufts University School of Engineering, having served on its Board of Advisors since 2006. She served as Chair of the US-China Business Council from 2013 to 2015. Since 2016, Ms. Kullman has been a member of the Temasek Americas Advisory Panel of Temasek Holdings (Private) Limited, a privately-held investment company based in Singapore. Ms. Kullman received a bachelor of science in mechanical engineering degree from Tufts University and a master's degree from the Kellogg School of Management at Northwestern University.

### Defendant Miles

52.     Defendant Miles has served as a Company director since 2020. She also serves as a member of the Audit Committee and the Governance and Nominating Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Miles beneficially owned 408 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Miles owned approximately $95,766 worth of Amgen stock.

53.     For the 2022 Fiscal Year, Defendant Miles received $359,813 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,774 in stock awards, and $20,039 in all other compensation. For the 2021 Fiscal Year, Defendant Miles received $359,970 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,970 in stock awards, and $20,000 in all other compensation. For the 2020 Fiscal Year, Defendant Miles received $158,825 in total compensation from the Company. This included $59,000 in fees earned or paid in cash and $99,825 in stock awards.

54.     The 2023 Proxy Statement stated the following about Defendant Miles:

Amy E. Miles was the Chief Executive Officer and a director of Regal Entertainment Group, Inc., or Regal Entertainment, a leading theatre exhibition company, having held these positions from 2009 through 2018, and its Chair of the Board from 2015 to 2018. From 2002 to 2009, Ms. Miles served as Executive Vice President, Chief Financial Officer and Treasurer of Regal Entertainment. Ms. Miles also served as Chief Executive Officer of Regal Cinemas, Inc., or Regal Cinemas, from 2009 to 2018, and its Executive Vice President, Chief Financial Officer and

Treasurer from 2000 to 2009. Ms. Miles joined Regal Cinemas in 1999 as Senior Vice President of Finance. Previously, Ms. Miles was with Deloitte & Touche, LLP and PricewaterhouseCoopers LLP.

Ms. Miles has been a director of Norfolk Southern Corporation, a transportation company, since 2014 and non-executive Chair of the Board since 2022, serving as the Chair of the Executive Committee and a member of the Governance and Nominating Committee and the Audit Committee. Ms. Miles has been a director of The Gap, Inc., an apparel retail company, since 2020, and chairs the Audit and Finance Committee and is a member of the Governance and Sustainability Committee. Ms. Miles was a director of National CineMedia, Inc., a cinema advertising company, from 2011 to 2015. She was a director of Townsquare Media, Inc., a radio, digital media, entertainment, and digital marketing solutions company, from 2014 until 2016. Ms. Miles serves on the board of trustees of the Boys and Girls Club of Eastern Tennessee. Ms. Miles received an undergraduate degree from the University of Tennessee.

### **Defendant Sugar**

55.     Defendant Sugar has served as a Company director since 2010. He also serves as the Chair of the Corporate Responsibility and Compliance Committee and as a member of the Executive Committee and the Governance and Nominating Committee.

56.     For the 2022 Fiscal Year, Defendant Sugar received $380,818 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $209,774 in stock awards, and $21,044 in all other compensation. For the 2021 Fiscal Year, Defendant Sugar received $379,970 in total compensation from the Company. This included $150,000 in fees earned or paid in cash, $209,970 in stock awards, and $20,000 in all other compensation. For the 2020 Fiscal Year, Defendant Sugar received $359,961 in total compensation from the Company. This included $140,000 in fees earned or paid in cash, $199,961 in stock awards, and $20,000 in all other compensation.

57.     The 2023 Proxy Statement stated the following about Defendant Sugar:

Ronald D. Sugar is the retired Chairman of the Board and Chief Executive Officer of Northrop Grumman Corporation, a global aerospace and defense company, having held these posts from 2003 through 2009.

21

Dr. Sugar has been a director of Chevron Corporation, a petroleum, exploration, production and refining company, since 2005, serving on the Management Compensation Committee and the Board Nominating and Governance Committee, and as lead independent director from 2015 to May 2022. Dr. Sugar has been a director of Apple Inc., a manufacturer and seller of, among other things, personal computers, mobile communication and media devices, since 2010, chairing the Audit and Finance Committee. Dr. Sugar has been a director of Uber Technologies, Inc., since 2018, serving as the Chair of the board of directors and chairing the Nominating and Governance Committee and serving on the Compensation Committee. Dr. Sugar served as a director of Air Lease Corporation, an aircraft leasing company, from 2010 to 2020, and chaired its Compensation Committee and served on the Nominating and Corporate Governance Committee. Since 2010, he has been a senior advisor to Ares Management LLC, a privately-held asset manager and registered investment advisor. In 2014, Dr. Sugar joined the Temasek Americas Advisory Panel of Temasek Holdings (Private) Limited, a privately-held investment company based in Singapore. Dr. Sugar is a member of the National Academy of Engineering, trustee of USC, member of the UCLA Anderson School of Management Board of Advisors, and director of the Los Angeles Philharmonic Association. Dr. Sugar received an undergraduate degree, master's degree, and doctorate from the University of California, Los Angeles.

### Defendant Williams

58.     Defendant Williams has served as a Company director since 2014. He also serves as a member of the Corporate Responsibility and Compliance Committee and the Governance and Nominating Committee. According to the 2023 Proxy Statement, as of March 20, 2023, Defendant Williams beneficially owned 5,301 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 20, 2023 was $234.72, Defendant Williams owned approximately $1.2 million worth of Amgen stock.

59.     For the 2022 Fiscal Year, Defendant Williams received $359,938 in total compensation from the Company. This included $130,000 in fees earned or paid in cash, $209,774 in stock awards, and $20,164 in all other compensation. For the 2021 Fiscal Year, Defendant Williams received $360,135 in total compensation from the Company. This included $130,000 in fees earned of paid in cash, $209,970 in stock awards, and $20,165 in all other compensation. For

22

the 2020 Fiscal Year, Defendant Williams received $340,414 in total compensation from the

Company. This included $120,000 in fees earned or paid in cash, $199,961 in stock awards, and

$20,453 in all other compensation.

60.     The 2023 Proxy Statement stated the following about Defendant Williams:

R. Sanders Williams is the President Emeritus of Gladstone Institutes, a non-profit
biomedical research enterprise, having served in this position since 2018, and was
the Chief Executive Officer of the Gladstone Foundation, a not-for-profit
organization supporting the Gladstone Institutes during 2018. Dr. Williams has
served as Professor of Medicine at Duke University since 2018 and, from February
2021 to January 2022, acted as Interim Vice President for Research and Innovation.
He has been a Professor of Medicine at the University of California, San Francisco
since 2010. Dr. Williams was both President of Gladstone Institutes and its Robert
W. and Linda L. Mahley Distinguished Professor of Medicine, from 2010 to 2017.
Prior to this, Dr. Williams served as Senior Vice Chancellor of the Duke University
School of Medicine from 2008 to 2010 and Dean of the Duke University School of
Medicine from 2001 to 2008. He was the founding Dean of the Duke-NUS
Graduate Medical School, Singapore, from 2003 to 2008 and served on its
Governing Board from 2003 to 2010. From 1990 to 2001, Dr. Williams was Chief
of Cardiology and Director of the Ryburn Center for Molecular Cardiology at the
University of Texas, Southwestern Medical Center.

Dr. Williams has been a director of the Laboratory Corporation of America
Holdings, a diagnostic technologies company, since 2007, chairing the Quality and
Compliance Committee and serving as a member of the Audit Committee. Since
2016, Dr. Williams also has served as a director of Tenaya Therapeutics, Inc., a
biotechnology company, chairing the Compensation Committee. Dr. Williams was
a director of Bristol-Myers Squibb Company, a pharmaceutical company, from
2006 until 2013. Dr. Williams has served on the board of directors of the Gladstone
Foundation, a non-profit institution that is distinct from Gladstone Institutes, since
2012. Dr. Williams was elected to the National Academy of Medicine in 2002. Dr.
Williams received his undergraduate degree from Princeton University and his
medical doctorate from Duke University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

61.     By reason of their positions as officers, directors, and/or fiduciaries of Amgen and

because of their ability to control the business and corporate affairs of Amgen, the Individual

Defendants owed Amgen and its shareholders fiduciary obligations of trust, loyalty, good faith,

and due care, and were and are required to use their utmost ability to control and manage Amgen

in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Amgen and its shareholders so as to benefit all shareholders equally.

62.     Each director and officer of the Company owes to Amgen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

63.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Amgen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

64.     To discharge their duties, the officers and directors of Amgen were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

65.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Amgen, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of Amgen's Board at all relevant times.

66.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

67.     To discharge their duties, the officers and directors of Amgen were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Amgen were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Amgen's own Code of Business Conduct and Ethics (the "Code of Conduct") and the Amgen Board of Directors Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Amgen conducted its operations, and, upon receipt of

notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Amgen and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Amgen's operations would comply with all applicable laws and Amgen's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

68.      Each of the Individual Defendants further owed to Amgen and the shareholders the duty of loyalty requiring that each favor Amgen's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

69.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Amgen and were at all times acting within the course and scope of such agency.

70.     Because of their advisory, executive, managerial, directorial, and controlling positions with Amgen, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

71.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Amgen.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

72.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

73.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

74.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal

material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Amgen was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

75.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

76.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Amgen and was at all times acting within the course and scope of such agency.

**AMGEN'S CODES OF COUNDUCT**

77.     Amgen's Code of Conduct, in a section title "Scope," states that "[e]very person conducting business for Amgen worldwide must follow and employ reasonable steps in preventing violations of this Code of Conduct, together with all applicable laws and company policies." It further notes that "[t]his includes all staff and levels of management as well as consultants, external workers, secondees, and temporary workers."

78.     In a section titled "Your Responsibilities," the Code of Conduct states the following, in relevant part:

Here are just a few ways you can Do The Right Thing.

**Act with honesty and integrity**
☐ Conduct business with honesty, integrity, and in a manner that protects Amgen's public image and reputation.

**Follow the rules**
☐ Follow the law and Amgen policies as you conduct company business.

**Respect others**
☐ Respect fellow staff members, government officials, our business partners, and our competitors.

**Ask**
☐ If you are unsure about what to do or have questions about law, policy, ethics or other compliance issues, ask your manager or contact the Business Conduct Hotline.

**Report violations**
☐ Promptly report all known or suspected violations of law, this Code or company policies through the Business Conduct Hotline. If someone asks you or pressures you to do something that might be a violation, report that also.

79.     The Company has also implemented a Code of Conduct exclusively for its Board. The Amgen Board of Directors Code of Conduct, as amended October 21, 2020, provides that "[Amgen's] standards for business conduct provide that we will uphold ethical and legal standards vigorously as we pursue our financial objectives, and that honesty and integrity will not be compromised by Amgen anywhere at any time."

80.     Furthermore, the Amgen Board of Directors Code of Conduct provides that the Board must "[a]bide by all applicable laws and regulations, Amgen's *Insider Trading Compliance Program* and the Amgen *Code of Conduct*."

81.     In a section titled "Guidelines," the Amgen Board of Directors Code of Conduct states the following:

In performing their Board and Board Committee functions, our directors will:

- ***Act diligently, openly, honestly and in good faith.***

29

- Provide leadership in advancing the company's mission, aspiration, values and leadership attributes.
- ***Discharge their duties, as members of the Board and of any Board Committees on which they serve, in accordance with their good faith business judgment and in the best interests of the company and its shareholders.***
- ***Become and remain familiar with Amgen's business and the economic and competitive environment in which the company operates and understand Amgen's principal business plans, strategies and objectives; operations results and financial condition; and relative marketplace position.***
- Commit the time necessary to prepare for, attend (in person, virtually or telephonically, as appropriate) and actively participate in regular and special meetings of the Board and of the Board Committees on which they serve.
- Inform the Chairman of the Board and the Chairman of the Board's Governance and Nominating Committee of changes in their employment, other board positions, relationships with other business, charitable, and governmental entities, and other events, circumstances or conditions that may interfere with their ability to perform their Board or Board Committee duties or impact the Board's assessment of whether they meet the independence requirements of Nasdaq and the Securities and Exchange Commission.
- Not enter into, without the prior approval of the disinterested members of the Board, any transaction or relationship with Amgen in which they will have a financial or personal interest (either directly or indirectly, such as through a family member or other person or organization with which they are associated), or any transaction or situation which otherwise involves a conflict of interest.
- Maintain the confidentiality of all material non-public information about Amgen, its business and affairs and make no use of it other than for furtherance of Amgen's interests, except when disclosure is authorized or legally mandated.

(Emphasis added.)

82.     Regarding waivers, the Amgen Board of Directors Code of Conduct states that "[a]ny waivers of this Board Code of Conduct must be approved and disclosed in accordance with any applicable rules and regulations of [NASDAQ] and [the SEC]."

83.     In violation of the Code of Conduct and the Amgen Board of Directors Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate

assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also

in violation of the Code of Conduct and the Amgen Board of Directors Code of Conduct, the

Individual Defendants failed to maintain the accuracy of Company records and reports, comply

with laws and regulations, conduct business in an honest and ethical manner, and properly report

violations of the Code of Conduct.

## AMGEN'S AUDIT COMMITTEE CHARTER

84.     The Company also maintains an Audit Committee Charter (the "Charter").

According to the Charter, the purpose of the Audit Committee is to, *inter alia*:

> [O]versee the accounting and financial reporting processes of the Company and the
> audits of the financial statements of the Company as required by the rules and
> regulations of The Nasdaq Stock Market, Inc. ("Nasdaq"). In addition, the
> Committee assists the Board of Directors (the "Board") in fulfilling its fiduciary
> responsibilities with respect to the oversight of the Company's affairs in the areas
> of financial accounting and reporting, the underlying internal controls and
> procedures over financial reporting, and the audits of the financial statements of the
> Company.

85.     In a section titled "Responsibilities," the Charter states that the Audit Committee

shall be tasked with, among other things:

> Discussing at least annually with management, the internal auditors and the
> independent auditors the adequacy and effectiveness of the Company's internal
> controls over financial reporting, disclosure controls and procedures, the integrity
> of its financial reporting processes, and the adequacy of its financial risk
> management programs and policies and enterprise risk management issues relating
> thereto, including recommendations for any improvements in these areas.

86.     The section continues by providing another responsibility of the Audit Committee

in regards to earnings press releases, noting that the Audit Committee is tasked with the following:

> Reviewing and discussing with management the Company's financial results,
> including a draft of the earnings press releases, prior to issuing the Company's
> quarterly and year-end earnings press releases.

87.     In a section titled "Risk Assessment and Management," the Charter states:

The Committee will review and discuss with management and the Auditors the Company's processes and policies on enterprise risk identification, management, and assessment in all areas of the Company's business, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company, including but not limited to data privacy, technology, information security (including data-security and back-up of information systems), competition, and regulation. Areas of focus for the Committee shall include the Company's policies and other matters relating to the Company's investments, cash management and foreign exchange management, major financial risk exposures, the adequacy and effectiveness of the Company's information security policies and practices and the internal controls regarding information security, and the steps taken by management to monitor and mitigate or otherwise control these exposures and to identify future risks.

88.     In violation of the Charter, Defendants Austin, Holley, Kullman, and Miles failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal controls over financial reporting, disclosure controls and procedures, and Code of Conduct and Amgen Board of Directors Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

89.     Amgen is a Delaware corporation based in California which was founded in 1980 and develops, manufactures, and delivers drugs for patients suffering from serious illnesses. The Company is one of the largest biopharmaceutical companies in the world, doing business in approximately 100 countries. For the 2022 Fiscal Year, the Company achieved revenues of over $26 billion, 70% of which came from product sales in the U.S., with the remaining 30% coming from international sales.

90.     Amgen boasts an extensive patented drug portfolio and operates an internal manufacturing network to supply its commercial production capabilities for, among other things, bulk drug manufacturing and device assembly. The Company performs these operations within the U.S. and its territories, which include Amgen's facilities in Puerto Rico, Rhode Island, and

California, as well as internationally. The Company also employs third-party contract manufacturers to assist in the efficient operation of the Company's commercial manufacturing network.

91.     Amgen maintains distribution centers for its drugs in Puerto Rico, as well as Kentucky, California, and the Netherlands. These facilities are substantially responsible for the worldwide distribution of the majority of Amgen's commercial and clinical products, with third-party distributors providing supplemental distribution.

92.     The Company purports to engage in a majority of its commercial manufacturing activities in Puerto Rico and has long claimed that it was properly taking advantage of significant favorable tax benefits provided by its Puerto Rico operations. Puerto Rico was treated as a foreign jurisdiction for U.S. tax purposes, meaning that the Company could receive certain favorable tax benefits from its Puerto Rico operations, including, but not limited to, a lower income tax, tax incentive grants available for upcoming years, and undistributed foreign earnings for which no U.S. income taxes or foreign withholding taxes were provided, as such earnings would purportedly be invested indefinitely outside the U.S.

93.     Largely as a result of its reliance on the tax implications of its Puerto Rico operations, the Company has historically been able to claim an extremely low effective tax rate, which is the percentage of taxes owed from the taxpayer's annual income. Indeed, for fiscal years 2013, 2014, and 2015, the Company claimed an effective tax rate of just 3.5%, 7.6%, and 13%, respectively. *The Motley Fool* explained this further, reporting in an article titled "3 Drugmakers That Probably Have Lower Tax Rates Than You Do" that "Amgen generated one-fifth of its total revenue in 2015 outside the U.S." *The Motley Fool* further reported that "[w]hile it paid the standard U.S. corporate tax rate of 35% on the rest of its revenue, the biotech deliberately invested

its international sales elsewhere rather than bring them into the U.S." and "Amgen also received some help due to an excise tax credit in Puerto Rico."

### *Amgen Receives NOPAs and RARs from the IRS as a Result of Its Tax Returns*

94.     Following an audit by the IRS in early 2017, the Company received NOPAs for the tax years 2010, 2011, and 2012. NOPAs are notices "generated when there is a difference between what the taxpayer reported on the tax return versus what was reported to the IRS by an employer, a bank or other payer."[3] The NOPAs here mainly arose from the profit allocations between the Company's facilities in the United States and Puerto Rico.

95.     On April 12, 2017, the Company received a RAR from the IRS for the tax years 2010, 2011, and 2012. The RAR contained proposed adjustments and was followed by the Company's receipt of a modified RAR in November 2017, also for tax years 2010, 2011, and 2012.

96.     Later, in April 2020, the Company received NOPAs proposing similar adjustments to Amgen's profit allocation for the tax years 2013, 2014, and 2015. These NOPAs were again followed by receipt of an RAR for tax years 2013, 2014, and 2015 in May 2020. Unbeknownst to investors, the numerous RARs revealed that the Company had improperly skirted U.S. tax laws for several years, was relying on a profit allocation system that violated the U.S. tax code, and owed billions of dollars in back taxes to the U.S. government.

97.     After receiving the NOPAs and related RARs, the Company failed to disclose the material adverse facts contained therein to investors. Instead, the Company concealed these facts from investors whilst simultaneously attempting behind the scenes to persuade the IRS to change its position regarding Amgen's tax accounting and to lower Amgen's total tax bill. In the end, all

---

[3]                          https://www.accountingplusinc.com/resources/quick-reads/irs-notices-101#:~:text=CP2000%3A%20Notice%20of%20proposed%20adjustment,can%20result%20in%20a%20refund.

of these appeals failed, leaving Amgen with no other internal IRS dispute mechanisms and making it substantially likely that the Company would have to pay billions of dollars to the U.S. government in back taxes and penalties.

### GAAP Requirements

98.     In accordance with Generally Accepted Accounting Principles ("GAAP"), the Company was required not only to disclose the existence of the tax dispute to investors, but also to provide investors with a reasonable estimate of the amount in dispute. GAAP also required that the Company disclose the likely impact to other tax years which had been assessed using the same tax treatment, to disclose anticipated penalties, and to take appropriate accruals.

99.     The tax dispute was a known loss contingency under Accounting Standards Codification Topic 450, *Contingencies* ("ASC 450"). Under ASC 450, a loss contingency is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible … loss … to an entity that will ultimately be resolved when one or more future events occur or fail to occur."

100.     In accordance with ASC 450, the estimated loss from a loss contingency shall be accrued by a charge to income if: (i) information available before the financial statements are issued indicates that it is probable that a liability had been incurred at the date of the financial statements; and (ii) the amount of loss can be reasonably estimated.

101.     ASC 450 states: (1) "probable" means "[t]he future event or events are likely to occur"; (2) that when no accrual is made, either because the loss is not "probable" or because the amount of loss cannot be "reasonably estimated," the loss contingency must still be disclosed if there is at least a reasonable possibility that a loss may have been occurred; (3) "reasonably possible" means the change of occurrence is "more than remote but less than likely."

102.     If ASC 450 requires that a disclosure be made, the issuer must include both the "nature of the contingency" and an "estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

103.     After receiving the NOPAs and related RARs, the Company failed to disclose the material adverse facts contained therein to investors. Instead, the Company concealed these facts from investors whilst simultaneously failing to take any meaningful accrual or otherwise reveal the massive amount of back taxes and penalties claimed by the United States government against the Company. Furthermore, the Company's SEC filings around this time period (and similar statements pertaining to its financial results), discussed in further detail below, failed to disclose the known trends, uncertainties, and true risks which resulted from Amgen's receipt of the RARs and the Company's failure to dissuade the IRS from the positions it held which were adverse to Amgen.

**False and Misleading Statements**

*July 29, 2020 10-Q*

104.     The Relevant Period begins on July 29, 2020 when the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2020 (the "2Q20 10-Q"), which was signed by Defendant Griffith. Attached to the 2Q20 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Griffith and Bradway attesting to the accuracy of the 2Q20 10-Q.

105.     The 2Q20 10-Q failed to disclose any meaningful tax liabilities accrual related to RARs or the Company's ongoing tax dispute with the U.S. government. Instead, the 2Q20 10-Q represented that existing accruals were "appropriate," stating the following, in relevant part:

As previously disclosed, we received an RAR from the IRS for the years 2010, 2011 and 2012. The RAR proposes to make significant adjustments that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. In November 2017, we received a modified RAR that revised the IRS's calculations but continued to propose substantial adjustments. ***We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office, which currently has jurisdiction over the matter. If we are unable to reach resolution, we will vigorously contest the proposed adjustments through the judicial process.*** In addition, as previously reported, in April 2020, we received draft NOPAs and subsequently in May 2020, we received an RAR from the IRS for the years 2013, 2014 and 2015, which are similar to the proposed adjustments for the years 2010, 2011 and 2012 that relate primarily to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. ***We disagree with the proposed adjustments and calculations and will pursue resolution with the IRS administrative appeals office.*** Final resolution of these complex matters is not likely within the next 12 months and could have a material impact on our condensed consolidated financial statements. ***We believe our accrual for income tax liabilities is appropriate based on past experience, interpretations of tax law and judgments about potential actions by tax authorities***; however, due to the complexity of the provision for income taxes, the ultimate resolution of any tax matters may result in payments substantially greater or less than amounts accrued.

(Emphasis added.)

### *October 29, 2020 10-Q*

106.     On October 29, 2020, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2020 (the "3Q20 10-Q"), which was signed by Defendant Griffith. Attached to the 3Q20 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Griffith and Bradway attesting to the accuracy of the 3Q20 10-Q.

107.     Like the 2Q20 10-Q, the 3Q20 10-Q failed to disclose any meaningful tax liabilities accrual related to the RARs or the Company's ongoing tax dispute with the U.S. government. Instead, the Company again represented that existing accruals were "appropriate." The 3Q20 10-Q made substantially the same representations regarding the RARs as made in the

2Q20 10-Q and highlighted in ¶105 above. However, the 3Q20 10-Q also noted that, in September

2020, the Company had "received a revised RAR that continues to propose substantial adjustments

for the years 2013, 2014, and 2015," but that the Company "disagree[d] with the proposed

adjustments and calculations and will pursue resolution with the IRS administrative appeals

office."

### *2020 10-K*

108.    On February 9, 2021, the Company filed its annual report on Form 10-K with the

SEC for the period ended December 31, 2020 (the "2020 10-K"), which was signed by Defendants

Bradway, Griffith, Austin, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and

Williams. Attached to the 2020 10-K were certifications pursuant to Rules 13a-14(a) and 15(d)-

14(a) under the Exchange Act and SOX signed by Defendants Griffith and Bradway attesting to

the accuracy of the 2020 10-K.

109.    The 2020 10-K failed to disclose any meaningful tax liabilities accrual related to

the RARs or the Company's ongoing tax dispute with the U.S. government. Instead, the Company

again represented that existing accruals were "appropriate." The 2020 10-K made substantially the

same representations regarding the RARs as made in the 2Q20 10-Q and highlighted in ¶105

above. However, the 2020 10-K also noted that the Company had "been unable to reach resolution

at the administrative appeal level, and we anticipate that we will receive a Notice of Deficiency

which we would expect to vigorously contest through the judicial process."

110.    The statements in paragraphs ¶¶104–109 above were materially false and/or

misleading and failed to disclose material adverse facts about the Company's business, operations,

and prospects. Specifically, the identified statements failed to disclose that: (1) the U.S.

government alleged that more than $3 billion in back taxes was owed by Amgen for the years

2010, 2011, and 2012; (2) the U.S. government alleged that more than $5 billion in back taxes was owed by Amgen for the years 2013, 2014, and 2015; (3) the U.S. government would likely allege the Company owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which Amgen had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (4) the Company failed to take sufficient accruals to account for its outstanding tax liabilities; (5) the Company failed to comply with ASC 450 and other applicable regulations when preparing its SEC filings; (6) the Company's refusal to pay its outstanding taxes to the U.S. government exposed Amgen to a significant risk of severe financial penalties imposed by the IRS; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *April 6, 2021 Proxy Statement*

111.    On April 6, 2021, the Company filed its Schedule 14A with the SEC (the "2021 Proxy Statement"). Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams solicited the 2021 Proxy Statement, which contained material misstatements and omissions.

112.    The 2021 Proxy Statement called for the Company's shareholders to vote for, *inter alia*: (1) the re-election of Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams to the Board; (2) the approval, on an advisory basis, of the Company's executive compensation; and (3) the selection of Ernst & Young LLP as the Company's independent registered public accountant for the 2021 Fiscal Year.

113.    Regarding the "Board's Role in Risk Oversight," the 2021 Proxy Statement stated the following, in relevant part:

Our Board oversees an enterprise-wide approach to risk management, which is designed to support the achievement of the Company's objectives, including its strategic priorities to improve long-term operational and financial performance and enhance stockholder interests. Our Board believes that a fundamental part of risk management is understanding the risks that we face, monitoring these risks, and adopting appropriate controls and mitigation activities for such risks. We believe that the risk management areas that are fundamental to the success of our enterprise include the areas of product development, safety and surveillance, supply and quality, value and access, sales and promotion, business development, as well as protecting our assets (financial, intellectual property, and information, including cybersecurity), all of which are managed by senior executive management reporting directly to our CEO.

We have implemented an Enterprise Risk Management, or ERM, program, which is a Company-wide effort to identify, assess, manage, report, and monitor enterprise risks that may affect our ability to achieve the Company's objectives. The ERM program involves our Board and management and is overseen by one of our senior executive officers. Enterprise risks are identified and managed by management and the business functions and, as discussed below, are overseen by the Board or the appropriate Board committee. ***Our Board has ultimate oversight responsibility for the risk management process. The Board discusses enterprise risks with our senior management on a regular basis, including as a part of its annual strategic planning process, annual budget review and approval, capital plan review and approval, and through reviews of compliance issues in the applicable committees of our Board, as appropriate.*** For example, the potential risks associated with COVID-19 are in areas of enterprise risk with respect to which our Board, Audit, Compensation, and Compliance Committees receive regular updates. All risk areas are appropriately monitored by management and all risk areas that could lead to business disruption, including the potential to cause severe financial or reputational harm, report to the Board regularly or as-needed, and are subject to appropriate Board oversight.

(Emphasis added.)

114.    Regarding the Code of Conduct and Amgen Board of Directors Code of Conduct,

the 2021 Proxy Statement stated the following, in relevant part:

Our Board has adopted two codes of business conduct, one that applies to our Board and a second that applies to our Board, all our staff, and others conducting business on our behalf. Annual training on the global code of conduct is required and our Board participates in such training. We also have a code of ethics for senior financial officers. To view our codes of business conduct and ethics, please visit our website at www.amgen.com(1). We intend to disclose any future amendments to certain provisions of our codes of business conduct and ethics, or waivers of such provisions, applicable to our directors and executive officers on our website. There

were no waivers of any of our codes of business conduct or code of ethics in 2020.

115.    The 2021 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and Amgen Board of Directors Code of Conduct were not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct and Amgen Board of Directors Code of Conduct. Further, the 2021 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

116.    As a result of Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

### *April 28, 2021 10-Q*

117.    On April 28, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2021 (the "1Q21 10-Q"), which was signed by Defendant Griffith. Attached to the 1Q21 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Griffith and Bradway attesting to the accuracy of the 1Q21 10-Q.

118.    Like the 2Q20 10-Q, the 1Q21 10-Q failed to disclose any meaningful tax liabilities accrual related to the RARs or the Company's ongoing tax dispute with the U.S. government. Instead, the Company again represented that existing accruals were "appropriate."

The 1Q21 10-Q made substantially the same representations regarding the RARs as made in the 2Q20 10-Q and highlighted in ¶105 above.

119.     The statements in paragraphs ¶¶ 117-118 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the U.S. government alleged that more than $3 billion in back taxes was owed by Amgen for the years 2010, 2011, and 2012; (2) the U.S. government alleged that more than $5 billion in back taxes was owed by Amgen for the years 2013, 2014, and 2015; (3) the U.S. government would likely allege the Company owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which Amgen had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (4) the Company failed to take sufficient accruals to account for its outstanding tax liabilities; (5) the Company failed to comply with ASC 450 and other applicable regulations when preparing its SEC filings; (6) the Company's refusal to pay its outstanding taxes to the U.S. government exposed Amgen to a significant risk of severe financial penalties imposed by the IRS; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins To Emerge As The False And Misleading Statements Continue**

*August 3, 2021 Earnings Release and Call*

120.     The truth began to emerge on August 3, 2021 when the Company issued an earnings release for its second fiscal quarter of 2021. In the release, the Company disclosed for the first time the substantial outstanding tax liabilities sought by the IRS. The earnings release disclosed that the Company had received a Notice of Deficiency from the IRS in July 2021. In the

Notice, the IRS sought $3.6 billion from Amgen in back taxes, plus interest, for the years 2010, 2011, and 2012, which was substantially more than what Defendants had previously led shareholders to believe. The earnings release also noted that the Company had filed a petition in the U.S. Tax Court to contest the Notice of Deficiency.

121.     That same day, the Company hosted a quarterly earnings call with analysts and investors, which was hosted by Defendants Bradway and Griffith. While on the call, Defendants Bradway and Griffith minimized the extent of the Company's tax liabilities. Indeed, when an analyst asked on the call if similar Notices of Deficiency were likely for subsequent tax years, Defendant Griffith responded that "the IRS' position is without merit" and that the Company had "appropriate tax reserves."

122.     Defendant Griffith also defended Amgen's position regarding its tax liabilities by pointing to the scope of its Puerto Rico operations, stating the following, in relevant part:

> And on your question around the IRS matter, the dispute, look, these notices are related to a transfer pricing dispute with the IRS regarding the allocation of the profits between the U.S. and the territory of Puerto Rico. So you can see we have a difference of opinion on the value of the significant risks and the complexity we undertake with activities performed at our Puerto Rico facility. We strongly believe the IRS' position is without merit, and we have appropriate tax reserves, and this dispute will take several years to resolve.
>
> I would like to note, Salim, that Puerto Rico is out flagship manufacturing facility, responsible for the majority of Amgen's global manufacturing. We're proud of our Puerto Rico operations, very proud of them and our colleagues there. We've had a major manufacturing presence in Puerto Rico for about 30 years. We have more than 2,200 highly skilled colleagues in Puerto Rico and who produce very sophisticated biologic medicine for patients all over the world with serious diseases. We've invested nearly $4 billion to expand and modernize those facilities in Puerto Rico, and we're proud to be consistently recognized as one of the island's best and most responsible employers.

123.     In addition, when asked about potential impacts of the IRS decision to subsequent tax years, Defendant Griffith reiterated that the Company had "adequate reserves" for ongoing

audits relating to tax years 2016, 2017, and 2018, though it was expected that the IRS would take similar positions with respect to those years.

### *August 4, 2021 10-Q*

124.     The following day, on August 4, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended June 30, 2021 (the "2Q21 10-Q"), which was signed by Defendant Griffith. Attached to the 2Q21 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Griffith and Bradway attesting to the accuracy of the 2Q21 10-Q.

125.     The 2Q21 10-Q failed to disclose any meaningful tax liabilities accrual related to the RARs or the Company's ongoing tax dispute with the U.S. government. Instead, the Company again represented that existing accruals were "appropriate," stating the following, in relevant part:

> In 2017, we received a Revenue Agent Report (RAR) and a modified RAR from the Internal Revenue Service (IRS) for the years 2010, 2011 and 2012 proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico. We disagreed with the proposed adjustments and calculations and pursued a resolution with the IRS administrative appeals office. As previously reported, we were unable to reach resolution with the IRS appeals office. In July 2021, we filed a petition in the U.S. Tax Court to contest two duplicate Statutory Notices of Deficiency (Notices) for 2010, 2011 and 2012 that we received in May and July 2021. The duplicate Notices seek to increase our U.S. taxable income by an amount that would result in additional federal tax of approximately $3.6 billion, plus interest. *Any additional tax that could be imposed would be reduced by up to approximately $900 million of repatriation tax previously accrued on our foreign earnings. In any event, we firmly believe that the IRS's positions in the Notices are without merit and we will vigorously contest the Notices through the judicial process.*
>
> In addition, in 2020, we received an RAR and a modified RAR from the IRS for the years 2013, 2014 and 2015 also proposing significant adjustments that primarily relate to the allocation of profits between certain of our entities in the United States and the U.S. territory of Puerto Rico, similar to those proposed for the years 2010, 2011 and 2012. We disagree with the proposed adjustments and calculations and are pursuing resolution with the IRS administrative appeals office. We are currently under examination by the IRS for the years 2016, 2017 and 2018.

(Emphasis added.)

126.    On this news, the Company's stock price fell 6.5%, or $15.77 per share, from a closing price of $244.08 per share on August 3, 2021 to close at $228.31 per share on August 4, 2021.

127.    Despite the partial emergence of the truth and accompanying stock drop, Defendants continued to make false and misleading statements to investors regarding the Company's business, operations, and prospects— particularly in regards to the likely outcome of the Company's outstanding tax liabilities—thereby causing the Company's stock price to remain artificially inflated.

**November 3, 2021 10-Q**

128.    On November 3, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the quarterly period ended September 30, 2021 (the "3Q21 10-Q"), which was signed by Defendant Griffith. Attached to the 3Q21 10-Q were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Griffith and Bradway attesting to the accuracy of the 3Q21 10-Q.

129.    The 3Q21 10-Q failed to disclose any meaningful tax liabilities accrual related to the RARs or the Company's ongoing tax dispute with the U.S. government. Instead, the Company again represented that existing accruals were "appropriate." The 3Q21 10-Q made substantially the same representations regarding the RARs as those made in the 2Q21 10-Q and highlighted in ¶125 above. In addition, the 3Q21 10-Q stated the following:

> As a consequence of the Tax Court litigation for the 2010-2012 period, the IRS administrative appeals office recently informed us that it does not plan to engage in discussion at this time regarding the allocation of profits between our entities in the United States and the U.S. territory of Puerto Rico for the 2013-2015 period.

**February 16, 2022 10-K**

130.    On February 16, 2022, the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2021 (the "2021 10-K") which was signed by Defendants Bradway, Griffith, Austin, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams. Attached to the 2021 10-K were certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Griffith and Bradway attesting to the accuracy of the 2021 10-K.

131.    The 2021 10-K failed to disclose any meaningful tax liabilities accrual related to the RARs or the Company's ongoing tax dispute with the U.S. government. Instead, the Company again represented that existing accruals were "appropriate." The 2021 10-K made substantially the same representations regarding the RARs as those made in the 2Q21 10-Q and highlighted in ¶125 above. In addition, the 2021 10-K stated that the Company had been "unable to reach resolution at the administrative appeals level," and "anticipate[d] that [it] will receive a statutory notice of deficiency for these years as well."

132.    The statements in paragraphs ¶¶ 121-125 and  ¶¶ 128-131 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) the U.S. government alleged that more than $3 billion in back taxes was owed by Amgen for the years 2010, 2011, and 2012; (2) the U.S. government alleged that more than $5 billion in back taxes was owed by Amgen for the years 2013, 2014, and 2015; (3) the U.S. government would likely allege the Company owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which Amgen had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (4) the Company failed to take sufficient accruals to account for its outstanding tax liabilities; (5) the Company failed to comply with ASC 450 and other

applicable regulations when preparing its SEC filings; (6) the Company's refusal to pay its outstanding taxes to the U.S. government exposed Amgen to a significant risk of severe financial penalties imposed by the IRS; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

133.    In addition, although Amgen was required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations, the Company's filings with the SEC during the Relevant Period failed to make such disclosures. In particular, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(b)(2)(ii) ("Item 303"), required Amgen to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sale or revenues or income from continuing operations." Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), meanwhile, required disclosure of "the material factors that ma[d]e an investment in [Amgen common stock] speculative or risky" and an explanation of "how [the] risk affect[ed] [Amgen]." The filings detailed above failed to disclose known trends and uncertainties and the true risks arising out of the Company's receipt of the RARs and failure to dissuade the IRS from its positions adverse to the Company in violation of Item 303 and Item 105. In fact, the purported risk disclosures provided in the Company's periodic financial filings were themselves materially misleading because they created the false and misleading impression that Amgen's outstanding tax liabilities were far lower than they really were.

### April 5, 2022 Proxy Statement

134.    On April 5, 2022, Amgen filed its Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Ishrak, Jacks,

Kullman, Miles, Sugar, and Williams solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

135.    The 2022 Proxy Statement called for the Company's shareholders to vote for, *inter alia*: (1) the reelection of Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams to the Board; (2) the approval, on an advisory basis, of the Company's executive compensation; and (3) the ratification of Ernst & Young LLP as the Company's independent registered public accountant for the 2022 Fiscal Year.

136.    Regarding the "Board's Role in Risk Oversight" the 2022 Proxy Statement stated the following:

> ***Our Board oversees an enterprise-wide approach to risk management, which is designed to support execution of our strategy and achievement of the Company's objectives to improve long-term operational and financial performance and enhance stockholder interests.*** Our Board believes that a fundamental part of risk management is understanding the risks that we face, adopting appropriate controls and mitigation activities for such risks, monitoring these risks, and responding to emerging developments for such risks.
>
> We have a Company-wide Enterprise Risk Management, or ERM, program, to identify, assess, manage, report, and monitor enterprise-level risks that may affect our ability to achieve the Company's objectives. The ERM program is overseen by our Executive Vice President and Chief Financial Officer and chaired by our Chief Audit Executive. Annually, we evaluate the greatest risks to our business, their underlying risk drivers, and the associated mitigation activities, maturity, and controls. Our Enterprise Risk Council, a cross-functional group of the Company's business leaders representing all key business functions, works to identify and assess risks that meet the pre-established criteria constituting an enterprise-level risk, and confirms that there is clear accountability and appropriate mitigation plans are in place, including monitoring and reporting. Additionally, emerging risks that do not rise to the level of enterprise-level risks, are assessed, discussed, and actively managed and monitored. We believe that the areas of risk that are fundamental to the success of our enterprise and rise to enterprise-level risks include the areas of product development, safety and surveillance, supply and quality, value (which includes pricing) and access, sales and promotion, business development, as well as protecting our assets (financial, intellectual property, and information, including cybersecurity), all of which are managed by senior executive management reporting directly to our CEO.

*The enterprise-level risks are overseen by the Board and the appropriate Board committee (as discussed below). The Board receives regular risk reporting from senior management, including an annual detailed review of the ERM program and key enterprise-level and emerging risks, as well as during the Board's annual strategic planning process, annual budget reviews and approvals, capital plan review and approval, and through reviews of compliance issues at the applicable committees of our Board, as appropriate.* For example, the risks associated with COVID-19 have the potential to affect areas of enterprise-level risk overseen by our Board, Audit Committee, Compensation Committee, and Compliance Committee and, as such, our risk mitigation plans and the effects of COVID-19 have been a topic regularly brought to and reviewed by the Board and its committees. For topics allocated to specific committees for their oversight, such as antitrust and competition regulation that is an area of the Compliance Committee's responsibilities (as discussed below), the Compliance Committee Chair oversees the Compliance Committee's annual calendar and meeting agendas to determine that the Company's activities in support of its compliance with antitrust and competition regulation are assessed regularly, including a full annual review that includes Amgen's policies, processes, and training to support such compliance, as well as regular updates of any significant industry developments at each Compliance Committee meeting. As is the practice for each of our committee Chairs, the Compliance Committee Chair reports out on these and other activities to the Board for its information and oversight at each regular Board meeting.

(Emphasis added.)

137.    Regarding the Code of Conduct and Amgen Board of Directors Code of Conduct, the 2022 Proxy Statement stated the following:

Our Board has adopted two codes of business conduct – the Amgen Board of Directors' Code of Conduct that applies to our Board and a global Code of Conduct that applies to our Board, all our staff, and others conducting business on our behalf. Annual training on the global Code of Conduct is required and our Board participates in such training. We also have a code of ethics for senior financial officers. To view our codes of business conduct and ethics, please visit our website at *www.amgen.com*.[2] We intend to disclose any future amendments to certain provisions of our codes of business conduct and ethics, or waivers of such provisions, applicable to our directors and executive officers on our website if such disclosure is required by SEC or NASDAQ rules. There were no waivers of any of our codes of business conduct or code of ethics in 2021.

138.    The 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and Amgen Board of Directors Code of Conduct were not followed, as evidenced by the Individual Defendants (1) making and/or

causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct and Amgen Board of Directors Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

139.    As a result of Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

## THE TRUTH FULLY EMERGES

### *April 27, 2022 Earnings Release*

140.    The truth fully emerged on April 27, 2022 when the Company issued an earnings release for its first fiscal quarter of 2022. The earnings release revealed that the Company had received a Notice of Deficiency from the IRS in April 2022 which sought ***$5.1 billion in back taxes***, plus interest, for tax years 2013, 2014, and 2015, and proposed a ***$2 billion penalty*** as a result of the Company's improper tax avoidance strategies. Collectively, the IRS claimed the amount owed by the Company to the U.S. government totaled ***more than $10 billion***, with additional back taxes likely to be owed by the Company for subsequent tax years for which Amgen had applied the same profit allocation treatment between its U.S. and Puerto Rico operations. The earnings release added that Amgen intended to file a petition in the U.S. Tax Court to contest the Notice of Deficiency, which it would seek to consolidate with its pending petition for earlier tax years.

141.     On this news, the price of Amgen common stock dropped 4.3%, or $10.66 per share, from a closing price of $248.79 per share on April 27, 2022 to close at $238.13 per share on April 28, 2022.  In the following days, the Company's stock price continued to decline, reaching a low of just $227.32 per share on May 2, 2022, which represented an 8.6% decline from the closing price on April 27, 2022.

142.     Amgen has also disclosed that it is under examination by the IRS for the 2016 to 2018 years for similar misconduct as noted in the prior Notices of Deficiency for the years 2010 to 2015, in addition to examinations by various state and foreign tax jurisdictions. Moreover, the Company has admitted that "the ultimate outcome of any tax matters result in payments substantially greater than amounts accrued and could have a material adverse effect on the results of our operations."

## REPURCHASES DURING THE RELEVANT PERIOD

143.     During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $2.9 billion to repurchase approximately 12 million shares of its own common stock at artificially inflated prices from July 2020 through April 2022.

144.     According to the 3Q20 10-Q, between July 1 and July 31, 2020, the Company repurchased 1,069,984 shares of its own common stock at an average price per share of approximately $252.92, for a total cost to the Company of approximately $270.6 million.[4]

145.     As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $17.1 million for repurchases of its own stock between July 1 and July 31, 2020.

---

[4] Upon information and belief, these shares were repurchased during the Relevant Period.

146.     According to the 3Q20 10-Q, between August 1 and August 31, 2020, the Company repurchased 1,004,844 shares of its own common stock at an average price per share of approximately $242.72, for a total cost to the Company of approximately $243.9 million.

147.     As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $5.8 million for repurchases of its own stock between August 1 and August 31, 2020.

148.     According to the 3Q20 10-Q, between September 1 and September 30, 2020, the Company repurchased 960,100 shares of its own common stock at an average price per share of approximately $246.50, for a total cost to the Company of approximately $236.6 million.

149.     As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $9.1 million for repurchases of its own stock between September 1 and September 30, 2020.

150.     According to the 1Q21 10-Q, between January 1 and January 31, 2021, the Company repurchased 696,324 shares of its own common stock at an average price per share of approximately $241.03, for a total cost to the Company of approximately $167.8 million.

151.     As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $2.8 million for repurchases of its own stock between January 1 and January 31, 2021.

152.     According to the 2Q21 10-Q, between April 1 and April 30, 2021, the Company repurchased 1,912,921 shares of its own common stock at an average price per share of approximately $244.13, for a total cost to the Company of approximately $467 million.

153.     As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $13.7 million for repurchases

of its own stock between April 1 and April 30, 2021.

154.    According to the 2Q21 10-Q, between May 1 and May 31, 2021, the Company repurchased 2,425,697 shares of its own common stock at an average price per share of approximately $248.21, for a total cost to the Company of approximately $602 million.

155.    As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $27.3 million for repurchases of its own stock between May 1 and May 31, 2021.

156.    According to the 2Q21 10-Q, between June 1 and June 30, 2021, the Company repurchased 2,180,367 shares of its own common stock at an average price per share of approximately $239.80, for a total cost to the Company of approximately $522 million.

157.    As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $6.2 million for repurchases of its own stock between June 1 and June 30, 2021.

158.    According to the 3Q21 10-Q, between July 1 and July 31, 2021, the Company repurchased 1,763,784 shares of its own common stock at an average price per share of approximately $245.52, for a total cost to the Company of approximately $433 million.

159.    As the Company's stock was actually worth only $238.13 per share, the price at closing on April 27, 2022, the Company overpaid by approximately $15.1 million for repurchases of its own stock between July 1 and July 31, 2021.

160.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $97.3 million.

## DAMAGES TO AMGEN

161.    As a direct and proximate result of the Individual Defendants' conduct, Amgen

has lost and will continue to lose and expend many millions of dollars.

162.     Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO and CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

163.     Such losses also include, but are not limited to, the fees associated with the examination by the IRS for the 2016 to 2018 years for similar misconduct as noted in the prior Notices of Deficiency for the years 2010 to 2015 and the similar examinations by various state and foreign tax jurisdictions.

164.     Such losses include the Company's overpayment of nearly $97.8 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

165.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

166.     As a direct and proximate result of the Individual Defendants' conduct, Amgen has also suffered and will continue to suffer a loss of reputation and goodwill, and a "lair's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## **DERIVATIVE ALLEGATIONS**

167.     Plaintiff brings this action derivatively and for the benefit of Amgen to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Amgen, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

168.     Amgen is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

169.     Plaintiff is, and has been at all relevant times, a shareholder of Amgen. Plaintiff will adequately and fairly represent the interests of Amgen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

### **DEMAND FUTILITY**

170.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

171.     A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Amgen's Board consisted of Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams (the "Director-Defendants"), along with non-party Michael V. Drake (collectively with the "Director-Defendants," the "Directors"). Plaintiff needs only to allege demand futility as to seven of the thirteen Directors that were on the Board at the time this action was filed.

172.     Demand is excused as to all of the Director-Defendants because each of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and

the other perpetrators of the scheme.

173.     Moreover, each of the Director-Defendants, that is, Austin, Bradway, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams, solicited the 2022 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Amgen. Similarly, Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams solicited the 2021 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to Amgen.

174.     In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Amgen to issue materially false and misleading statements. Specifically, the Director-Defendants caused Amgen to issue false and misleading statements which were intended to obscure Amgen's tax liabilities. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested or independent, and demand upon them is futile, and thus excused.

175.     Additional reasons that demand on Defendant Bradway is futile follow. Defendant Bradway has served as CEO of the Company since 2012. He has also served as a Company director since 2011 and as Chairman of the Board since 2013. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Bradway with his principal occupation for which he receives handsome compensation, including, for instance, $21,399,733 for the 2022 Fiscal Year. As the Company's CEO, Defendant Bradway was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings refenced herein. As the Company's highest officer, he conducted little, if

any, oversight of the scheme to make and/or to cause the Company to make false and misleading statements and to fail to correct them, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Bradway solicited the false and misleading 2021 and 2022 Proxy Statements which resulted in his re-election to the Board. Furthermore, Defendant Bradway signed the 2020 10-K and the 2021 10-K, both of which contained false and misleading elements, and attested to their accuracy. Defendant Bradway also has significant experience and knowledge in the biopharmaceutical and financial sectors and is well informed of the various laws and regulations the Company was required to abide by during the Relevant Period. For these reasons, Defendant Bradway breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176. Additional reasons that demand on Defendant Austin is futile follow. Defendant Austin has served as a Company director since 2017. She also serves as a member of the Audit and Compensation and Management Development Committees. Defendant Austin has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. As a member of the Audit Committee, Defendant Austin failed in performing her duties, especially "with respect to the oversight of the Company's affairs in the areas of financial accounting and reporting," Defendant Austin also solicited the false and misleading 2020 and 2021 Proxy Statements which resulted in her re-election to the Board. Furthermore, Defendant Austin signed, and thus personally made, the false and misleading statements/omissions in the 2020 and

2021 10-Ks. For these reasons, Defendant Austin breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

177.    Additional reasons that demand on Defendant Druker is futile follow. Defendant Druker has served as a Company director since 2018. He also serves as a member of the Compensation and Management Development and the Corporate Responsibility and Compliance Committees. Defendant Druker has received and continues to receive compensation for his role as a director as described above. As a trusted company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Druker also solicited the false and misleading 2021 and 2022 Proxy Statements which resulted in his re-election to the Board. Furthermore, Defendant Druker signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Druker breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

178.    Additional reasons that demand on Defendant Eckert is futile follow. Defendant Eckert has served as a Company director since 2012 and is the Lead Independent Director. He also serves as Chair of the Compensation and Management Development Committee and as a member of the Executive and Governance and Nominating Committees. Defendant Eckert has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls

over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Eckert also solicited the 2021 and 2022 Proxy Statements which resulted in his re-election to the Board. Furthermore, Defendant Eckert signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Eckert breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

179.    Additional reasons that demand on Defendant Garland is futile follow. Defendant Garland has served as a Company director since 2013. He also serves as the Chair of the Governance and Nominating Committee and as a member of the Compensation and Management Development and Executive Committees. Defendant Garland has received and continued to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Garland also solicited the false and misleading 2021 and 2022 Proxy Statements which resulted in his re-election to the Board. Furthermore, Defendant Garland signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Garland breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

180.    Additional reasons that demand on Defendant Holley is futile follow. Defendant Holley has served as a Company director since 2017. He also serves as the Chair of the Audit Committee and as a member of the Executive and Governance and Nominating Committees. Defendant Holley has received and continues to receive compensation for his role as a director as

described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. As Chair of the Audit Committee, Defendant Holley failed in performing his duties, especially with "respect to the oversight of the Company's affairs in the areas of financial accounting and reporting." Defendant Holley also solicited the false and misleading 2021 and 2022 Proxy Statements, which resulted in his re-election to the Board. Furthermore, Defendant Holley signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Holley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

181.    Additional reasons that demand on Defendant Ishrak is futile follow. Defendant Ishrak has served as a Company director since 2021. He also serves as a member of the Compensation and Management Development and Corporate Responsibility and Compliance Committees. Defendant Ishrak has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ishrak also solicited the false and misleading 2022 Proxy Statement, which resulted in his election to the Board. Furthermore, Defendant Ishrak signed, and thus personally made, the false and misleading statements in the 2021 10-K. For these reasons, Defendant Ishrak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon

him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Jacks is futile follow. Defendant Jacks has served as a Company director since 2012. He also serves as a member of the Compensation and Management Development and Corporate Responsibility and Compliance Committees. Defendant Jacks has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Jacks also solicited the 2021 and 2022 Proxy Statements which resulted in his re-election to the Board. Furthermore, Defendant Jacks signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Jacks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Kullman is futile follow. Defendant Kullman has served as a Company director since 2016. She also serves as a member of the Audit and Governance and Nominating Committees. Defendant Kullman has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. As a member of the Audit Committee, Defendant Kullman failed in performing her duties, especially with "respect to the oversight of the Company's affairs in the areas of financial

accounting and reporting." Defendant Kullman also solicited the false and misleading 2021 and 2022 Proxy Statements which resulted in her re-election to the Board. Furthermore, Defendant Kullman signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Kullman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

184.     Additional reasons that demand on Defendant Miles is futile follow. Defendant Miles has served as a Company director since 2020. She also serves as a member of the Audit and Governance and Nominating Committees. Defendant Miles has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. As a member of the Audit Committee, Defendant Miles failed in performing her duties, especially with "respect to the oversight of the Company's affairs in the areas of financial accounting and reporting[.]" Defendant Miles also solicited the false and misleading 2021 and 2022 Proxy Statements which resulted in her re-election to the Board. Furthermore, Defendant Miles signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Miles breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

185.     Additional reasons that demand on Defendant Sugar is futile follow. Defendant Sugar has served as a Company director since 2010. He also serves as the Chair of the Corporate

Responsibility and Compliance Committee and as a member of the Executive and Governance and Nominating Committees. Defendant Sugar has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Sugar also solicited the false and misleading 2021 and 2022 Proxy Statements which resulted in his re-election to the Board. Furthermore, Defendant Sugar signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Sugar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.     Additional reasons that demand on Defendant Williams is futile follow. Defendant Williams has served as a Company director since 2014. He also serves as a member of the Corporate Responsibility and Compliance and the Governance and Nominating Committees. Defendant Williams has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Williams also solicited the false and misleading 2021 and 2022 Proxy Statements which resulted in his re-election to the Board. Furthermore, Defendant Williams signed, and thus personally made, the false and misleading statements in the 2020 and 2021 10-Ks. For these reasons, Defendant Williams breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and

thus demand upon him is futile and, therefore, excused.

187.   Additional reasons that demand on the Board is futile follow.

188.   Defendants Austin, Holley, Kullman, and Miles (collectively, the "Audit Committee Defendants") serve as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct and the Amgen Board of Directors Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

189.   In violation of the Code of Conduct and the Amgen Board of Directors Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct and the Amgen Board of Directors Code of Conduct by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure

the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct, the Amgen Board of Directors Code of Conduct, and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct and the Amgen Board of Directors Code of Conduct, are not disinterested, and demand is excused as to them.

190.    Amgen has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for the wrongful conduct to attempt to recover for Amgen any part of the damages Amgen suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

191.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

192.    The acts complained of herein constitute violations of fiduciary duties owed by Amgen's officers and directors, and these acts are incapable of ratification.

193.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate

funds, i.e., monies belonging to the stockholders of Amgen. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Amgen, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

194.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Amgen to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

195.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least seven of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## <u>FIRST CLAIM</u>
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

196.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

197.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of

such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

198.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

199.    Under the direction and watch of the Director-Defendants, the 2021 and 2022 Proxy Statements failed to disclose that, contrary to the 2021 and 2022 Proxy Statements' descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing and/or permitting the Company to issue false and misleading statements, and were not complying with the Code of Conduct or the Amgen Board of Directors Code of Conduct.

200.    The 2021 and 2022 Proxy Statements also failed to disclose that: (1) the U.S. government alleged that more than $3 billion in back taxes was owed by Amgen for the years 2010, 2011, and 2012; (2) the U.S. government alleged that more than $5 billion in back taxes was owed by Amgen for the years 2013, 2014, and 2015; (3) the U.S. government would likely allege the Company owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which Amgen had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (4) the Company failed to take sufficient accruals to account for its outstanding tax liabilities; (5) the Company failed to comply with ASC 450 and other

applicable regulations when preparing its SEC filings; (6) the Company's refusal to pay its outstanding taxes to the U.S. government exposed Amgen to a significant risk of severe financial penalties imposed by the IRS; and (7) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

201.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2021 and 2022 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 and 2022 Proxy Statements, including but not limited to, the election of Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams to the Board.

202.    The false and misleading elements of the 2021 Proxy Statement led to, among other things, the election of the Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Jacks, Kullman, Miles, Sugar, and Williams, which allowed them to continue to breach their fiduciary duties to Amgen.

203.    The false and misleading elements of the 2022 Proxy Statement led to, among other things, the election of the Defendants Austin, Bradway, Druker, Eckert, Garland, Holley, Ishrak, Jacks, Kullman, Miles, Sugar, and Williams, which allowed them to continue to breach their fiduciary duties to Amgen.

204.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2021 and 2022 Proxy Statements.

205.    Plaintiff, on behalf of Amgen, has no adequate remedy at law.

**SECOND CLAIM**

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of
the Securities Exchange Act**

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth
above, as though fully set forth herein.

207.    The Individual Defendants participated in a scheme to defraud with the purpose
and effect of defrauding Amgen. Not only is Amgen now defending claims that is violated Section
10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also
one of the largest victims of the unlawful scheme perpetrated upon Amgen by the Individual
Defendants. With the price of its common stock trading at artificially inflated prices due to the
Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase
hundreds of thousands of its own shares at artificially inflated prices, damaging Amgen.

208.    During the Relevant Period, the Individual Defendants also individually and in
concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce
and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify
the Company's press releases, public statements made in earnings calls, and periodic and current
reports filed with the SEC.

209.    The Individual Defendants employed devices, schemes, and artifices to defraud
while in the possession of adverse, material, non-public information and engaged in acts, practices
and a course of conduct that included the making of, or participation in the making of, untrue
and/or misleading statements of material facts and/or omitting to state material facts necessary in
order to make the statements made about Amgen not misleading.

210.    The Individual Defendants as top executives acted with scienter during the Relevant
Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or

omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

211.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934**

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    The Individual Defendants, by virtue of their positions with Amgen and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Amgen and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Amgen to engage in the illegal conduct and practices complained herein.

214.    Plaintiff, on behalf of Amgen, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    Each Individual Defendant owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of Amgen's business and affairs.

217.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

218.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Amgen.

219.    Moreover, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about Amgen's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) the U.S. government alleged that more than $3 billion in back taxes was owed by Amgen for the years 2010, 2011, and 2012; (2) the U.S. government alleged that more than $5 billion in back taxes was owed by Amgen for the years 2013, 2014, and 2015; (3) the U.S. government would likely allege the Company owed materially more to the U.S. government than investors had been led to believe for subsequent tax years for which Amgen had used the same profit allocation treatment between its U.S. and Puerto Rico operations; (4) the Company failed to take sufficient accruals to account for its outstanding tax liabilities; (5) the Company failed to comply with ASC 450 and other applicable regulations when preparing its SEC filings; (6) the Company's refusal to pay its outstanding taxes to the U.S. government exposed Amgen to a significant risk of severe financial penalties imposed by the IRS; and (7)  the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading and/or

lacked a reasonable basis at all relevant times.

220.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, thus rendering them personally liable to the Company for breaching their fiduciary duties.

221.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

222.   The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

223.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

224.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

225.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Amgen has sustained and continues to sustain significant damages. As a

result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

226.   Plaintiff, on behalf of Amgen, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

227.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

228.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Amgen.

229.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Amgen that was tied to the performance or artificially inflated valuation of Amgen, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

230.   Plaintiff, as a shareholder and representative of Amgen, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

231.   Plaintiff, on behalf of Amgen, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

232.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

233.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Amgen, for which they are legally responsible.

234.     As a direct and proximate result of the Individual Defendants' abuse of control, Amgen has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

235.     Plaintiff, on behalf of Amgen, has no adequate remedy at law.

### SEVENTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

236.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Amgen in a manner consistent with the operations of a publicly-held corporation.

147.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Amgen has sustained and will continue to sustain significant damages.

148.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

149.     Plaintiff, on behalf of Amgen, has no adequate remedy at law.

### EIGHTH CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

150.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

151.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the

Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

153. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

154. Plaintiff, on behalf of Amgen, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Amgen, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Amgen;

(c) Determining and awarding to Amgen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Amgen and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amgen and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Amgen to nominate at least seven candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Amgen restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: December 1, 2023

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*_____
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
        shashmi@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**

76

Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
        eitank@bgandg.com

*Counsel for Plaintiff*

DocuSign Envelope ID: 7F06FEC4-ABC3-443B-959F-25516F5D8F3B

## VERIFICATION

I, Cheri Clearwater, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 1 __ day of December, 2023.

DocuSigned by:

Cheri Clearwater

343C5D8C7CE142D...

Cheri Clearwater